**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

JOSE SEGOVIA and
JESUS SEGOVIA,

Plaintiffs,

v. Civil No. 2:23-cv-00763-GJF-DLM

UNITED STATES OF AMERICA,

Defendant.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On March 16-18, 2026, the parties tried this case to the Court. The evidence consisted of 57 documentary or photographic exhibits, two demonstrative exhibits, and the live testimony of nine witnesses. At the conclusion of the evidentiary phase, the Court gave the parties several weeks to submit closing arguments and proposed findings of fact and conclusions of law, tasks the parties completed on May 6, 2026. *See* Dkt. Nos. 163–66.

The Court listened carefully to the trial testimony, examined each exhibit, and took 21 single-spaced pages of contemporaneous notes to assist its recollection of the evidence. In addition, the Court has since read the trial transcript in its entirety and taken additional notes. Now having thoroughly considered all the evidence, the parties' written submissions, and relevant authority, the Court issues its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

To the extent there was conflicting evidence presented as to any fact found by the Court, the Court has credited the testimony and exhibits supporting the finding and did not credit any contradictory testimony or exhibits. The findings and conclusions contained herein are only those the Court considered essential to its Judgment. No inference should be drawn about the Court's view of any proposed findings or conclusions submitted by the parties not discussed here.

## FINDINGS OF FACT

**The Collision**

1. On Wednesday, March 24, 2021, Joseph Dean Montoya was a Special Agent of the United States Drug Enforcement Administration ("DEA"). He had been so employed since October 1998.

2. At approximately 2:00 p.m., while in the course and scope of his employment, Agent Montoya was driving his government-issued 2017 full-size Chevy Silverado 2500.

3. Before the Silverado was issued to Agent Montoya, it had been "lifted" approximately two inches above normal factory specifications, which tended to enlarge the blind spot behind the truck.

4. The Silverado was not equipped with a back-up camera.

5. Agent Montoya had the tint on the driver's and front passenger's side windows lightened to improve visibility at night.

6. Agent Montoya parked in the south side of the parking lot of the Circle K at the corner of El Paseo Road and Idaho Avenue in Las Cruces, New Mexico. He was backed in, facing north, surveilling another vehicle in the parking lot that was occupied by a DEA suspect.

7. It was raining heavily and the parking lot was congested with automobile and pedestrian traffic.

8. Around the same time, Plaintiff Jose Segovia drove his 2007 Honda Civic into the Circle K parking lot to refuel. His 26-year-old adult son and co-plaintiff, Jesus Segovia, occupied the front passenger seat.

9. Jose Segovia was 58 years old. Stricken by polio at age eight and deprived of the use of his legs, Jose had the Civic modified so he could drive it using only his arms and hands.

10. Jesus Segovia refueled the Civic at one of the Circle K gas pumps and then resumed his place in the passenger seat. Because of the amount of traffic seeking to exit onto El Paseo Road, Jose Segovia pulled nose-first into a parking space on the south side of the parking lot to wait approximately one minute for the traffic to clear.

11. Meanwhile, the target vehicle that Agent Montoya was surveilling departed the parking lot, heading eastbound on Idaho Avenue. Agent Montoya radioed the other members of the surveillance team to advise of the target vehicle's location and direction so that one of them could "take the eyeball," vernacular for assuming primary surveillance.

12. After waiting momentarily so as not to be conspicuous about his surveillance, Agent Montoya then endeavored to access Idaho Avenue to follow the target vehicle. As he approached the Idaho exit from the parking lot, however, a westbound vehicle was turning into the Circle K at such a shallow angle that it would not have been able to enter the parking lot unless Agent Montoya moved the Silverado. Consequently, Agent Montoya backed the Silverado up to allow the other vehicle to cross in front of him.

13. The vehicle for which Agent Montoya backed up to make room did not move and by now other vehicles added to the bottleneck at the Idaho exit. Agent Montoya decided to back up some more to get away from the bottleneck and perhaps exit onto El Paseo instead of Idaho.

14. In a lifted, full-size Silverado with a substantial blind spot not ameliorated or neutralized by a backup camera, on a rainy day in a parking lot congested with vehicles and pedestrians, Agent Montoya then backed up the full length of the Circle K store, threading his way through the narrow strait between the gas pumps and the store's front door. And he did so with the express purpose of rejoining the surveillance and immediately after his initial attempt to depart the parking lot had been frustrated by events outside his control.

15. Around the same time as Agent Montoya was backing his way past the front of the store, Jose Segovia was backing the Civic out of the parking space in a leftward direction, with the intent to exit onto El Paseo Road.

16. Agent Montoya backed up at idle speed as he checked his mirrors and looked behind him. He was using neither the radio nor his cellphone, and he was not otherwise distracted. Nonetheless, despite his efforts, Agent Montoya's Silverado impacted Jose Segovia's Civic. Neither Agent Montoya nor Jose Segovia saw the other's vehicle before the impact.

17. The Court finds Agent Montoya 100% at fault for this collision. Although he testified that he was not in a hurry to exit the parking lot to resume surveillance, the Court drew the exact opposite inference. Agent Montoya's decision-making as a driver on that afternoon fell well beneath the standard of ordinary care, and the Court has no difficulty assigning him full legal responsibility for the relatively minor collision that he caused.

18. Both Segovias were wearing their seatbelts at the time of the impact.

19. During their testimony, the occupants of the two vehicles described the magnitude of the impact in very different terms. As detailed *infra*, however, the testimony the Court finds most credible about the magnitude of the impact came from a witness *not* personally involved in it: accident reconstructionist and biomechanical forensic engineer Matthew Mecham.

20. Agent Montoya got out of the Silverado to determine what happened. He checked on both occupants of the Civic, asking them in Spanish something like "Estas bueno?" (All good?). Both occupants of the Civic nodded their heads and said, "Yeah."

21. Agent Montoya checked both vehicles, called his supervisor, called dispatch, and took photographs of both vehicles. [Ex. 11 (composite of nine photographs of various aspects of scene of collision, including the location and condition of the vehicles)].

22. Both Segovias appeared to be uninjured after the impact.

23. Jesus Segovia did not report pain or injuries to Agent Montoya or to any of the other DEA personnel who responded to the parking lot. Similarly, he did not report pain or injury to Las Cruces Police Department Police Service Aid Matthew Torres who was dispatched to the collision and prepared a "courtesy report" requested by the DEA, even though Torres ordinarily would not prepare a report for a collision on private property that resulted in no injuries.

24. For his part, Jose Segovia told DEA Special Agent Jorge Cerda (who was detailed to the scene because of his Spanish fluency) that his neck was a little sore, with a pain level at 2 out of 10. Jose Segovia assured Agent Cerda that his condition was nothing major and he did not need medical attention. Agent Cerda did not see any other outward appearance of injury to Jose Segovia.

25. The Civic suffered damage to the right rear quarter-panel.

26. Other than possible scuff marks on the rear bumper, the Silverado was not damaged.

27. Neither vehicle's airbags deployed during the collision.

**Opinions of Matthew D. Mecham, M.S., P.E.**

28. Without objection, the Court permitted Mr. Mecham to testify under Federal Rule of Evidence 702 in the areas of accident reconstruction and biomechanical analysis. Mr. Mecham explained that the discipline of accident reconstruction examines what happens to vehicles during a collision, whereas biomechanical analysis focuses on what happens to their occupants. The Court finds his trial testimony and his reports [Exs. 52 and 81] to be wholly credible, including the following opinions, inferences, and conclusions.

29. The Silverado was travelling less than four miles per hour at the time of impact.

30. The damage to the Civic and the absence of striation marks or damage to the right taillight suggests that the Civic was stationary or nearly so at the time of impact.

31. The impact involved a "very benign, extremely minor, lateral contact between the Chevy Silverado and the Honda Civic" and was "probably one of the most minor" of the more than 2,000 automobile incidents that Mr. Mecham has investigated or reconstructed. Tr. Vol. 3 at 94. This collision produced a resulting risk of injury that was "very minor. . . [v]ery mild." *Id.*

32. The impact caused the Civic's tires to move no more than one foot at its rear end and no more than six inches at its center.

33. The impact caused the Civic to rock back and forth in a lateral, right-to-left direction. The Civic's suspension system rocked to accommodate the impact.

34. The location of impact on the Civic and the laws of physics, particularly the principle of applied force direction, would not allow for *frontward* movement of the occupants of the Civic, in contrast to Jesus Segovia's description.

35. Jose Segovia and Jesus Segovia moved inside the Civic only a few inches or less to the right side of the Civic's interior. The collision resulted in minor side-to-side jostling without sufficient force to cause either of them to strike anything inside the Civic's interior.

36. The movement distance of Jose Segovia and Jesus Segovia inside the Civic was substantially less than the distance that the rear of the Civic moved because the impact was eight feet behind the Civic's center mass, which is where the Segovias were seated.

37. The low velocity impact of the collision and the fact that Jose Segovia and Jesus Segovia wore seatbelts also limited their movement inside the Civic.

38. Jesus Segovia's relatively heavy stature of 270 pounds would have caused him to experience less acceleration than if he had been lighter, thereby further minimizing his risk of injury.

39. The right rear corner of the Silverado's rigid bumper impacted the softer and more compliant sheet metal of the Civic's right rear quarter-panel. The V-shaped indentation to the Civic

occurred when the focused load of the corner of the bumper impacted and deformed the hollow area of the right rear quarter-panel.

40. The velocity change for the Civic at the time of the collision was no more than 1.5 mph. Such a velocity change would have caused Jose Segovia and Jesus Segovia to experience a G-force of no more than 1.4g.

41. A G-force of 1.4g is comparable to levels encountered during activities of normal living like standing up (measured at 1.9g), coughing (measured at 3.5g), sneezing (measured at 2.9g), or being jostled in a crowd (measured at 3.6g). In addition, a G-force of 1.4g is much lower than the force encountered when hopping (measured at 5.7g), skipping rope (measured at 5g), running with an abrupt stop (measured at 4.5g), or falling into a chair (measured at 10.1g).

**Jose Segovia's Background**

42. Jose Segovia lives in Vado, New Mexico, with his two adult sons, Jose Fernando Segovia, age 33, and Jesus Gerardo Segovia, age 31.

43. Jose Segovia was born in Mexico in 1962, moved to the United States when he was about 18 years old, and settled in the Las Cruces area in 1995.

44. Jose Segovia has been living with the effects of polio and using a wheelchair for 54 years. He cannot put any weight on his legs.

45. Jose Segovia's last employment was at a newspaper called *The Dispatch* in Gilroy, California, for three years ending in 1989.

46. Jose Segovia has received monthly Social Security checks since 1990.

47. Jose Segovia has Medicaid and Medicare health insurance.

48. Jose Segovia has had UnitedHealthcare and Presbyterian health insurance coverage since 1989.

49. Jose Segovia does not pay for his health insurance, whether in the form of premiums, co-pays, or otherwise.

**Jose Segovia's Prior Auto Accidents**

**2011 Taco Bell Accident**

50. In or around 2011, Jose Segovia was parked in his Honda Civic (the same one as involved here) at a Taco Bell parking lot on El Paseo Road in Las Cruces. Another car was moving in reverse when its rear bumper and hitch struck the right passenger side rear and front doors of the Civic.

51. Jose Segovia did not make a claim on the insurance of the other driver because the officer that responded to the accident said that Jose Segovia and the other driver were mutually at fault for the accident.

52. Jose Segovia does not recall whether he hired legal counsel after the Taco Bell accident.

**2014 I-25 Accident**

53. In or around 2014, Jose Segovia was the front-seat passenger in a Honda Accord driven by Plaintiff Jesus Segovia. Jose Segovia's other son, Jose Fernando, was in the back seat.

54. Jesus Segovia was driving south on I-25 near Lohman Avenue in Las Cruces when a pickup cut in front of the Segovias and suddenly stopped, causing the Accord to collide with the rear of the pickup.

55. Jose Segovia hired a lawyer after the accident.

56. Jose Segovia's lawyer assisted him in seeing a chiropractor for injuries to his middle back caused by the accident.

57. Both of Jose Segovia's sons also sought chiropractic treatment after the accident.

58. Jose Segovia received a monetary settlement from the I-25 accident.

59. Although Jose Segovia denied being involved in any other vehicle accident other than the Taco Bell (2011) and I-25 (2014) accidents, his testimony was not entirely credible on that point. He was involved in a collision on January 27, 2018, at the intersection of North Main and Elks Road in Las Cruces. Jose Segovia was driving the Civic, with his two sons as passengers. Although airbags did not deploy and the Civic was not otherwise damaged, Jose Segovia reported being injured. *See* Ex. 1.1 at 00016 (doctor's note dated February 2018 stating "2 recent mva [or motor vehicle accidents] with left shoulder issues."); Tr. Vol. 3 at 63.[1]

60. The Civic, which had been modified so that Jose Segovia could drive it only with his arms and hands, was also in another accident on October 5, 2017, resulting in damage to the rear of the vehicle. *See* Ex. 52 at 10-11; Tr. Vol. 3 at 63. This is at or near the same impact location on the Civic that occurred in the instant case. Given that Jose Segovia owned the Civic at that time, was its principal (if not sole) driver, and told a doctor in February 2018 that he had been in *two* "recent" accidents, the Court finds that Jose Segovia was also involved in the collision on October 5, 2017.

**Jose Segovia's Prior Complaints of Pain**

61. Prior to the collision at issue, Jose Segovia had a long-standing, multi-faceted, and complex medical history, including a significant history of chronic pain.

62. Jose Segovia denied any complaints of *neck* pain prior to the subject collision. His voluminous medical record (Ex. 1.1-1.17) revealed some documented history of *neck* pain and discomfort [*see, e.g.*, Ex. 1.1 at 00097], although that history paled in comparison to his complaints of pain in other parts of his spine and upper torso.

---

[1] From time to time in these Findings and Conclusions, the Court cites to specific Bates numbers of specific exhibits for ease of reference. In every instance, the Bates number correlates to the "Segovia Trial" Bates number in red letters on the lower left side of the exhibit page.

63. The Court finds Jose Segovia to be a somewhat unreliable narrator of his medical history. His trial testimony differed from his deposition testimony on multiple issues, including (1) whether he previously complained of upper back and/or midback pain; (2) whether he previously complained of shoulder pain; (3) whether he previously complained of pain in his arms; (4) whether he previously used narcotics for pain relief for his lower back or for any other condition; (5) whether he had ever been *diagnosed with* chronic pain; (6) whether he had ever *experienced* chronic pain; (7) whether he had ever been on a contract to receive narcotic pain medication; and (8) whether he took pain medication in the 2016-2020 time frame.

64. Jose Segovia's medical records contradict important parts of his trial testimony regarding his prior pain and his use of narcotics to manage it. What follows are summaries of 13 visits that Jose Segovia made to his primary care physician in the three years leading up to the collision at issue in this case. Where the records differed from Jose Segovia's trial testimony, the Court has credited the records.

65. On February 2, 2018, Jose Segovia presented at Continuity Care Center MountainView ("CCMV") for medical care. [Ex. 1.1 at 00112-00113]. The medical records included "Reviewed Problems," which noted "Post poliomyelitis syndrome – onset 02/02/2018 ... Chronic pain – onset 02/02/2018 – shoulder and back," and the list of medications reviewed included hydrocodone 5 mg-acetaminophen 325 mg tablet, gabapentin 300 mg (for nerve pain), and naproxen 375 mg (an NSAID). [Ex. 1.1 at 00114-116]. The purpose of the visit was "[m]edication refill, bilateral shoulder pain and to establish care." [Ex. 1.1 at 00114]. Dr. Michael Bell, Jose Segovia's primary care physician, noted "chronic pain. [R]efill narcotics and check pmp today. I have given him a new pain contract[,] but it is in English. Review lcdf records for last drug screen." [Ex. 1.1 at 00116]. The discussion note mentioned "2 recent mva [or motor vehicle accidents] with left shoulder issues. [R]equest images sunview and rtc 2 weeks. [W]e may need to

refer to ortho." [Ex. 1.1 at 00116]. Additionally, Dr. Bell noted that Jose Segovia "is a pt from lcdf with chronic bilateral shoulder pain and back pain. He is in a wheelchair and has post-polio syndrome. [H]e has been maintained on narcots and nsaids." [Ex. 1.1 at 00115].

66. On February 16, 2018, Jose Segovia presented again at CCMV. [Ex. 1.1 at 00111]. The Reviewed Problems included "Degenerative polyarthritis – Onset 02/16/2018 . . . Chronic pain – Onset 02/02/2018 – shoulder and back" and the list of medications included hydrocodone 5 mg-acetaminophen 325 mg tablet, 300 mg gabapentin (for nerve pain), and 375 mg naproxen (an NSAID). [Ex. 1.1 at 00111-112]. Jose Segovia reported that "his pain is ok, but he does have right shoulder pain. [H]is neck and back are stable." [Ex. 1. 1 at 00113]. Dr. Bell assessed Jose Segovia with chronic pain and impingement syndrome of the right shoulder region. In the medical discussion notes, Dr. Bell noted Jose Segovia "has pain contract/pmp check uds next visit . . . right shoulder pain; sunview had neck/elbow film. Order shoulder film and rtc 2 weeks." [Ex. 1.1 at 00113].

67. On March 16, 2018, Jose Segovia presented again at CCMV. The Reviewed Problems were the same and the list of medications included hydrocodone 5 mg-acetaminophen 325 mg tablet, 300 mg gabapentin (for nerve pain), and 375 mg naproxen (an NSAID). [Ex. 1.1 at 00108]. Dr. Bell noted that Jose Segovia's "shoulder is better, his xrays are consistent with arthritis, his back is better as well." [Ex. 1.1 at 00109]. Dr. Bell also noted that Jose Segovia is a long-term current user of opiate analgesic drug. Under discussion notes, Dr. Bell stated, "chronic pain on nsaids, gabapentin and vicodin. [I] have checked pmp last month. [H]e has contract. [U]ds (urine drug screen) 3/18 with opiates and cannabis. I have asked him to stop cannabis or apply for medical cannabis and stop the vicodin, he will think on this." [Ex. 1.1 at 00107]. Dr. Bell further noted: "post polio syndrome. arthritis shoulder and back. xrays done. we have pain contract." [Ex. 1.1 at 00110].

68. On April 13, 2018, Jose Segovia presented again at CCMV. The Reviewed Problems were the same and the list of medications included hydrocodone 5 mg-acetaminophen 325 mg tablet, 300 mg gabapentin (for nerve pain), and 375 mg naproxen (an NSAID). [Ex. 1.1 at 00105]. Dr. Bell noted that Jose Segovia "is on narcotics and just had his urine drug screen. [H]e does smoke marijuana for stress. [H]e does not have medical card for his MJ." [Ex. 1.1 at 00106]. Under discussion notes, Dr. Bell advised, "chronic pain on nsaids, gabapentin and vicodin. [I] have checked pmp last month. [H]e has contract. [U]ds 3/18 with opiates and cannabis. I have asked him to stop cannabis or apply for medical cannabis and stop the vicodin. [H]e will think on this." [Ex. 1.1 at 00107].

69. On May 11, 2018, Jose Segovia presented again at CCMV. The Reviewed Problems were the same and the list of medications included hydrocodone 5 mg-acetaminophen 325 mg tablet, 300 mg gabapentin (for nerve pain), and 375 mg naproxen (an NSAID). [Ex. 1.1 at 00102-103]. Dr. Bell noted that Jose Segovia refilled his hydrocodone one week ago. [Ex. 1.1 at 00104].

70. On July 11, 2018, Jose Segovia presented again at CCMV. The Reviewed Problems were the same and the list of medications included hydrocodone 5 mg-acetaminophen 325 mg tablet, 300 mg gabapentin (for nerve pain), and 375 mg naproxen (an NSAID). [Ex. 1.1 at 00099–100]. Dr. Bell noted that Jose Segovia has "chronic pain on 3 agents. [T]oday he has left shoulder pain," and in another section noted, Jose Segovia is "not taking medical marijuana. [H]e has opiate contract." [Ex. 1.1 at 00101].

71. On October 15, 2018, Jose Segovia presented again at CCMV. The Reviewed Problems were the same and the list of medications included hydrocodone 5 mg-acetaminophen 325 mg tablet, 300 mg gabapentin (for nerve pain), and 375 mg naproxen (an NSAID). [Ex. 1.1 at 00095–96]. Dr. Bell noted that Jose Segovia "is on chronic narcotics and is due for pmp check and uds eval. [H]e has pain contract." Under the heading of ROS (report of systems), Dr. Bell noted

that Jose Segovia "has chronic shoulder pain *and neck*." [Ex. 1.1 at 00097 (emphasis added)]. Dr. Bell referred Jose Segovia to physical therapy and noted that Jose Segovia has "leg weakness and atrophy from polio with shoulder *and neck* discomfort but good range of motion." *Id.* (emphasis added). Dr. Bell also noted that Jose Segovia has long-term current use of opiate analgesic drug and needed another urine drug screen. Under discussion notes, Dr. Bell stated "chronic pain on narcotics, time to check pmp and uds. [H]e has pain contract." *Id.*

72. On January 11, 2019, Jose Segovia presented again at CCMV. The Reviewed Problems were the same and the list of medications included hydrocodone 5 mg-acetaminophen 325 mg tablet, 300 mg gabapentin (for nerve pain), and 375 mg naproxen (an NSAID). [Ex. 1.1 at 00092]. Under discussion notes, Dr. Bell stated "chronic pain on narcotics and nsaids. [U]ds documented. [H]as pain contract. [C]check pmp." [Ex. 1.1 at 00093].

73. On April 15, 2019, Jose Segovia presented again at CCMV. The Reviewed Problems were the same and the list of medications included hydrocodone 5 mg-acetaminophen 325 mg tablet, 300 mg gabapentin (for nerve pain), and 375 mg naproxen (an NSAID). [Ex. 1.1 at 00088]. Dr. Bell noted that Jose Segovia "has had pain in his left elbow. His chronic pain is mainly shoulders and back[]. He has post[-]polio syndrome and uses a wheelchair. He attributes his high bp to his pain." [Ex. 1.1 at 00089]. Dr. Bell's "assessment/plan" included "chronic pain." [Ex. 1.1 at 00089]. Dr. Bell's discussion notes stated, "chronic pain on narcotics. [T]oo early for refill. [C]hecked pmp with each refill. [H]as pain contract and up to date urine screen. [A]lso on nsaids." [Ex. 1.1 at 00090].

74. On May 23, 2019, Jose Segovia presented again at CCMV. The Reviewed Problems were the same and the list of medications included hydrocodone 5 mg-acetaminophen 325 mg tablet, 300 mg gabapentin (for nerve pain), and 375 mg naproxen (an NSAID). [Ex. 1.1 at 00084–85].

75. On August 14, 2019, Jose Segovia presented again at CCMV. The Reviewed Problems were the same and the list of medications included hydrocodone 5 mg-acetaminophen 325 mg tablet, 300 mg gabapentin (for nerve pain), and 375 mg naproxen (an NSAID). [Ex. 1.1 at 00080-83]. Dr. Bell noted that Jose Segovia "has been on narcotics for chronic pain. [H]e takes gabapentin and nsaids as well. [H]is pain is mainly shoulders, elbow and back." [Ex. 1.1 at 00082]. Dr. Bell noted, "Long-term current use of opiate analgesic drug." Dr. Bell decided to transition Jose Segovia "to acetaminophen from [V]icodin when he runs out [of Vicodin]." Dr. Bell prescribed acetaminophen 500 mg capsule, but noted to pharmacy, "do not start until he runs out of hydrocodone about [S]ept 5th, 2019." [Ex. 1.1 at 00083]. Under discussion notes, Dr. Bell stated "chronic pain back shoulders, post polio, uses marijuana, on nsaids and gabapentin. [H]e has been on chronic narcotics. [H]e has one month left. [W]ill rx Narcan and recheck uds. [H]e also has controlled substance agreement. [I] am going [to] try and change him to acetaminophen from vicodin when he runs out." [Ex. 1.1 at 00083].

76. On January 23, 2020, Jose Segovia presented again at CCMV. The Reviewed Problems were the same and the list of medications included 500 mg acetaminophen and 375 mg naproxen. [Ex. 1.1 at 00077]. Dr. Bell noted that Jose Segovia "has had chronic pain shoulders and back[]. He has had polio and uses a wheel chair. . . . [W]e have had him on chronic narcotics in the past. [H]e also takes nsaids. We have tried acetaminophen as well as gabapentin in past. [C]urrently not on narcotics but still with pain mainly back and shoulders." [Ex. 1.1 at 00078]. Dr. Bell diagnosed Jose Segovia with chronic pain. The discussion notes include "chronic pain, arthritis back and shoulder, wheel chair use and post polio on nsaids. [H]ad been on narcotics and Tylenol in past. Fill out NM medical form today." [Ex. 1.1 at 00079].

77. On October 21, 2020, Jose Segovia presented at CCMV for follow up regarding chronic pain. The Reviewed Problems were as previously noted and the list of medications

included 500 mg acetaminophen g and 15 mg meloxicam (an NSAID). [Ex. 1.1 at 00073-74]. Dr. Bell noted that Jose Segovia "has chronic pain and post-polio syndrome. He is in a wheel chair. [H]is pain is upper shoulders and back[]. He stopped nsaids, uses acetaminophen, he never got marijuana card due to cost. He also requests to see rheumatology. He has pain left elbow pain and swelling." [Ex. 1.1 at 00074].

**Jose Segovia's Claimed Injury from March 24, 2021 Collision**

78. In the Circle K parking lot shortly after the collision, Jose Segovia complained of minor neck pain, but felt like the pain would pass. Tr. Vol. 2 at 77:19-24.

79. The following day, March 25, 2021, at 12:48 p.m., Jose Segovia presented at MountainView Urgent Care, reporting that he was "in a mva [motor vehicle accident] yesterday moving at low speed," and complaining of "neck pain and pain in between shoulder blades." [Ex. 1.1 at 00003]. X-ray imaging taken that day showed no evidence of a fracture or dislocation. [Ex. 1.1 at 00001, 00006]. Jose Segovia was prescribed ibuprofen (600 mg tablets) to take as necessary over the next seven days. [Ex. 1.1 at 00006]. Jose Segovia was advised to follow up with preventative medicine if he did not see significant improvement in the next one to two weeks. [Ex. 1.1 at 00006].

80. Jose Segovia did not follow up with preventative medicine. Instead, as set forth *infra*, he opted for a regimen of chiropractic treatment, cervical facet injections, and, ultimately, cervical fusion surgery.

**Jesus Segovia's Prior Auto Accidents**

81. At trial, Jesus Segovia attempted to minimize the number of automobile accidents in which he had been involved. He testified that other than the subject accident, he was involved in only "two or three" other accidents.

82. Jesus Segovia was involved in an accident in 2019 or 2020 in which someone crossed in front of him, causing him to injure his neck for which he received chiropractic treatment.

83. Jesus Segovia was in another auto accident in 2017 or 2018 when someone did not yield the right of way to him. He claimed he was not injured and did not go to a chiropractor but thought he went to the hospital.

84. Jesus Segovia was in the same 2014 accident on I-25 that involved his father. Jesus Segovia said he hurt his upper back and neck and received chiropractic care afterward.

85. Jesus Segovia admitted on cross-examination to being involved in four other vehicle accidents before the collision at issue. For example, in 2016, the vehicle he was driving was rear-ended near the intersection of South Main Street and El Paseo Road in Las Cruces.

86. As another example, Jesus Segovia was involved in a collision on January 27, 2018, on Elks Drive and North Main in Las Cruces. The same day, he went to MountainView Regional Medical Center complaining of headaches and back pain and reporting that he was wearing a seatbelt in the front passenger seat when his car was rear-ended while it was stopped. He reported his pain was 8 out of 10. He received Motrin (200 MG) and Cyclobenzaprine (10 MG), a muscle relaxant. [Ex. 2.2 at 02378, 02381-02382].

87. Jesus Segovia was involved in still another accident in September 2019 near a Sonic parking lot near El Paseo Road and Missouri Avenue in Las Cruces. He was driving a 2009 Yukon SUV at approximately 30 mph when another car pulled out of the Sonic driveway and caused the collision. Jesus Segovia complained of injury to his middle back and left and right knee pain. He was referred to a chiropractor by an attorney.

88. Jesus Segovia was involved in another accident in January 2020 on Solano Drive in Las Cruces. He was driving a Mitsubishi Lancer when a truck pulled out approximately ten feet in front of him and Jesus Segovia's car struck the truck at approximately 35 mph.

89. Jesus Segovia was involved in two vehicle accidents that post-date the collision at issue. On February 12, 2024, he was driving a 2016 Silverado pickup in the roundabout at South Main and Water Street, when another driver struck the Silverado on the passenger door. The other driver was driving about 5-10 mph and t-boned Jesus Segovia's truck, causing Jesus Segovia's body to move sideways, although no part of his body struck any part of the inside of his truck.

90. Jesus Segovia presented to MountainView Regional Medical Center the next day and reported that he was in a car crash the day prior and he had back and left leg (calf) and right foot pain. X-rays were taken of Jesus's lumbar spine, left leg, and right foot, with no concerns noted. Jesus Segovia received a Toradol injection in the hospital and a prescription for Ibuprofen and tramadol. [Ex. 2.1 at 02245-02248].

91. Then, on February 14, 2024, only two days later, Jesus Segovia was driving another pickup in another roundabout when he was t-boned by another vehicle. He apparently did not seek treatment following that collision.

**Jesus Segovia's Claimed Injury from March 24, 2021 Collision**

92. With respect to the collision at issue, Jesus Segovia claimed that at the point of impact his body moved *forward*, his head moved *forward*, and his glasses fell off.

93. The Court does not find that description credible, particularly because of Mr. Mecham's testimony that physics would have caused Jesus Segovia's body to move sideways, if at all, but not forward. In addition, the Court finds the description of the impact to be so severe as to knock Jesus Segovia's glasses from his head to be exaggerated.

94. Although Jesus Segovia denied any pain or injury from the collision to law enforcement personnel at the Circle K, he went the next day to MountainView Urgent Care and reported "bilateral knee pain[,] neck pain and mid back pain[,]" but not low back pain where the

subsequent surgery occurred. [Ex. 2.1 at 02175]. He was prescribed ibuprofen for knee and scapular pain. [Ex. 2.1 at 2176-2177].

95. Jesus Segovia was advised that if he experienced any acute worsening of symptoms or no significant improvement in the next one to two weeks, to follow up with preventative medicine for further evaluation and management. [Ex. 2.1 at 02177].

96. Jesus Segovia did not follow up with preventative medicine. [Ex. 2.1]. Instead, he too opted for a regimen of chiropractic treatment, facet injections, and, ultimately, partial lumbar discectomy surgery.

**Jesus Segovia's 2021 Employment**

97. Jesus Segovia generally worked more hours in the weeks and months after the accident (and before the December 2021 surgery) than before the accident [Ex. 7]:

| Date | Hours worked | Paycheck |
|---|---|---|
| January 16-31, 2021 | 45 | 432.76 |
| February 1-15, 2021 | 78 | 740.45 |
| February 16-28, 2021 | 57.25 | 557.06 |
| March 1-15, 2021 | 76.75 | 728.96 |
| **Accident occurred March 24, 2021** | | |
| March 16-31, 2021 | 68.25 | 648.67 |
| April 1-15, 2021 | No paycheck provided in Ex. 7 for these weeks | |
| April 16-30, 2021 | 91.5 (includes 4.5 overtime) | 879.88 |
| May 1-15, 2021 | 87.5 (includes 8 overtime) | 862.05 |
| May 16-31, 2021 | 89 (includes 1 overtime, 8 holiday) | 846.21 |
| June 1-15, 2021 | No hours worked but received Covid Bonus | 500.00 |
| June 16-30, 2021 | 97.75 (includes 16.25 overtime) | 975.95 |
| July 1-15, 2021 | 109.5 (includes 4.25 overtime, 8 holiday, 8 holiday overtime) | 1,053.17 |
| July 16-31, 2021 | 93.75 (includes 5.25 overtime) | 902.65 |
| August 1-15, 2021 | 99 (includes 1.75 overtime) | 928.41 |
| August 16-31, 2021 | 83.75 (includes 9.75 overtime) | 838.22 |
| September 1-15, 2021 | 108 (includes 6.25 overtime, 8 holiday, 1.5 holiday overtime) | 1,106.79 |

**Unsolicited Post-Collision Involvement of Ernesto and Follow-On Treatment**

98. Within a week after the collision, a man named Ernesto cold-called Jose Segovia and told him he should hire an attorney as a result of the subject accident. Neither Jose Segovia nor Jesus Segovia knew who Ernesto was or his last name.

99. Jose Segovia does not know how Ernesto obtained his phone number.

100. Ernesto referred the Segovias to the Herring Law Firm in Houston, Texas.

101. Ernesto told Jesus Segovia that he needed a lawyer to be able to receive treatment from a chiropractor.

102. Someone employed by or affiliated with the Herring Law Firm steered the Segovias to Chiropractor Luis Marioni at My Medical Group in Las Cruces.

103. Chiropractor Marioni in turn referred the Segovias to Southwest X-Ray. [Ex. 1.3 at 00271, 00275; Ex. 2.4 at 03187 (referring provider: Marioni)].

104. Chiropractor Marioni also referred Jose Segovia and Jesus Segovia to Bratislav Velimirovic, M.D. (who Jose Segovia refers to as "Dr. V"), a surgeon in El Paso, Texas. Jose Segovia described Dr. Velimirovic as receiving very bad on-line reviews.

105. Dr. Velimirovic gave Jose Segovia a series of cervical facet injections. [Ex. 1.5 at 00499-00510].

106. Jose Segovia testified that the neck injections helped, but not much.

107. Dr. Velimirovic reported that Jose Segovia described his pain level at 3/10 on April 29, 2021; 3/10 on May 13, 2021; 2/10 on May 26, 2021; 1/10 on June 11, 2021; and 5/10 on July 12, 2021. [Ex. 1.5 at 00499, 00502, 00505, 00508, 00511].

108. Dr. Velimirovic repeatedly described Jose Segovia's gait as "unsteady, gait antalgic, gait and station unsteady, spastic, shuffling, loss of balance …." [Ex. 1.5 at 00499, 00502,

00505, 00508, 00511]. The Court discounts the reliability of these records as Jose Segovia has been non-weight bearing on his legs since childhood and uses a wheelchair.

109. Jesus Segovia also received injections from Dr. Velimirovic but claimed that the injections did not help his pain.

110. Chiropractor Marioni then referred the Segovias to a surgeon in Arizona, who ultimately performed surgery on both of them. At the time of this referral, the Herring Law Firm still represented the Segovias. [Tr. Vol. 2 at 132:22-24; Ex. 1.12 at 01609].

111. Jose Segovia reported to Niteen Andalkar, MD, of East Valley Neurosurgery, LLC, in Chandler, Arizona, that the subject automobile accident caused "substantial damage to his vehicle" and that he was "taken to the hospital for evaluation." [Ex. 1.2 at 01461, 01468]. The Court finds that description to be exaggerated both with respect to damage to the vehicle and injury to its driver. Jose Segovia denied having neck pain and associated symptoms prior to the accident. *Id.*

112. Jose Segovia and Jesus Segovia had three meetings with Dr. Andalkar before the surgery (October 1, 2021 (telemedicine); October 20, 2021 (telemedicine), and December 13, 2021 (the first in-person session, the day before their surgeries). [Ex. 1.1 at 01461-01472; Ex. 2.8 at 03406, 03443].

113. On December 16, 2021, two days after surgery, Dr. Andalkar recommended that Jesus Segovia should have light activity for 4-6 weeks and then start physical therapy and an exercise program. [Ex. 2.8 at 03431].

114. Instead of starting physical therapy, Jesus Segovia returned to Chiropractor Marioni upon the advice of his Texas attorney. [Ex. 1.4 at 00344; Ex. 1.13 at 01974]. Even though he thought the chiropractor's care before the surgery provided little help, Jesus Segovia went back to

Chiropractor Marioni because he was following what his lawyer told him to do. This was true even though the lawyer's direction contravened his surgeon's advice.

115. In February 2022, Dr. Andalkar recommended that Jose Segovia start physical therapy post-surgery, stating that he "believe[s] she [sic] will benefit from physical therapy" and "[he] may slowly resume his normal activities." [Ex. 1.12 at 01459]. Instead, Jose Segovia started *chiropractic* therapy in March 2022 with Dr. Marioni and did not begin physical therapy until September 30, 2022.

116. Jose Segovia and Jesus Segovia did not start physical therapy until September 30, 2022, more than nine months post-surgery and more than three months after their last chiropractic sessions with Dr. Marioni. [Ex. 1.13 at 02045; Ex. 2.13 at 04440].

117. Jose Segovia and Jesus Segovia were referred to physical therapy by their new lawyers at Flores, Tawney & Acosta, PC. [Ex. 1.13 at 01974; Ex. 2.13 at 04371].

118. The Herring Law Firm sent a letter to Southwest X-Ray dated April 5, 2021 (twelve days after the collision), representing that the firm will pay reasonable and necessary charges incurred for medical services and that payment will be made from any verdict or settlement related to the March 24, 2021, motor vehicle accident. [Ex. 1.3 at 00309-310].

119. Southwest X-Ray placed "a lien against any recovery of proceeds paid by any insurance carrier or from whatever source, settlement, judgment or verdict which may be paid." [Ex. 1.3 at 00312].

120. Jose Segovia's signed waiver of private insurance forms provided to him by his attorney at the Herring Law Firm resulted in the waiver of private health insurance for various medical procedures he received. [Exs. 100, 101].

121. Jose Segovia did not know he was waiving private health insurance (e.g., Medicare) when signing waiver of private insurance forms.

122. The waiver of private insurance forms were in English though Jose Segovia does not know how to read English, and the forms were not translated for him into Spanish.

123. The Herring Law Firm sent a letter to Apex (East Valley Neurosurgery) dated November 16, 2021, which included a "deferral agreement for medical treatment" stating reasonable and necessary charges incurred for medical services will be paid from any verdict or settlement related to the March 24, 2021, motor vehicle accident. [Ex. 1.12 at 01554].

124. In a document entitled "Lien/Letter of Protection," Jose Segovia agreed that Apex (East Valley Neurosurgery) would delay seeking payment until "monies are obtained from a settlement, payment, award, or judgment." [Ex. 1.9 at 00836]. The document does not state that Apex (East Valley Neurosurgery) would never seek payment for medical services provided.

125. The Lien/Letter of Protection also states, in English and not translated into Spanish, that Jose Segovia agrees that he does not have Medicaid/Medicare benefits and that he did not intend to seek care from a Medicaid provider. *Id.*

126. The Lien/Letter of Protection further states that medical services will not be provided by Apex (East Valley Neurosurgery) if Jose Segovia was seeking reimbursement for the medical services from Medicaid or Medicare. *Id.*

127. Red Rock Diagnostics, LLC ("Red Rock") purchased the account relative to Jose Segovia from "Services Rendered at SJM – National Imaging Center." Red Rock purchased Sun View Imaging, LLC's debt and lien for payment of medical care. [Ex. 1.7 at 00584].

128. Jose Segovia signed a Lien Form and Waiver of Private Insurance, written in English, related to Sun View Imaging. [Ex. 1.7 at 00598-00599].

129. Jose Segovia did not understand that he waived private health insurance to pay for treatment or know why he waived his private health insurance to pay for treatment.

130. Chiropractor Marioni appears to provide services through two different entities, My Doctor Medical Group and Joint and Spine Centers of New Mexico. [*Compare* Exs. 1.2, 1.4, and 2.3]. The medical records and bills provided for each entity are identical and reflect care provided by Chiropractor Marioni. [*Compare* Exs. 1.2, 1.4 (both for Jose Segovia), and 2.3 (Jesus Segovia)].

131. The chiropractic records of Jose Segovia and Jesus Segovia are virtually the same despite both having different alleged injuries from the collision at issue. [*Compare* Exs 1.2, 1.4 (both for Jose Segovia), and 2.3 (Jesus Segovia)]. The dates of care, services rendered, descriptions, and trend lines are the same for Jose Segovia and Jesus Segovia.

132. Jose Segovia had approximately 51 chiropractic visits with Dr. Marioni from March 31, 2021, to August 2, 2021. [Exs. 1.2 and 1.4]. Jesus Segovia had approximately 48 chiropractic visits with Dr. Marioni during the exact same time frame. [Ex. 2.3].

133. For each chiropractic visit, there is a bill for each medical activity/task completed. According to the bills, Jose Segovia received virtually the same treatment at each visit: (1) electric stimulation-manual; (2) vasopneumatic devices massage; (3) ultrasound; (4) low-level laser app (one or more); and (5) vertebral axial decompression. [Exs. 1.2 and 1.4].

134. Jesus Segovia received the same treatments: (1) electric stimulation-manual; (2) vasopneumatic devices massage; (3) ultrasound; (4) low-level laser app (one or more); and (5) vertebral axial decompression (although low-level laser app (one or more) was less common). [Ex. 2.3].

135. For each chiropractic visit, Dr. Marioni noted the alleged subjective pain score and the body part provided by the patient. [Exs. 1.2, 1.4, 2.3].

136. Dr. Marioni documented Jose Segovia's pain as follows: first few visits, pain score was 8 out 10; next few visits, pain score was 7 out of 10; next few visits, pain score was 6 out of 10; next few visits, pain score was 5 out of 10; next few visits, pain score was 4 out of 10; and the

last three visits pain score was 3 out of 10. [Exs. 1.2 and 1.4]. Despite the pain level being 3 out of 10 (and trending downward over the visits), Dr. Marioni referred Jose Segovia for surgery.

137. Dr. Marioni documented Jesus Segovia's pain as follows: first few visits, pain score was 8 out of 10; next few visits, pain score was 7 out of 10; next few visits, pain score was 6 out 10; next few visits, pain score was 5 out of 10; next few visits, pain score was 4 out of 10; and the last two visits, pain score was 3 out of 10. [Ex. 2.3]. Despite the pain level being 3 out of 10 (and trending downward over the visits), Dr. Marioni referred Jesus Segovia for surgery.

138. For each chiropractic visit, Dr. Marioni would note an "assessment" in the records for each patient, and the options were: "Unchanged," "Improved," "Exacerbation," "Slight Improvement," "Much Improvement," and "Worse."

139. For Jose Segovia, in the "assessment" section, the first chiropractic visit had an "assessment" of "improved" (even though that was the first visit), and "improved" was always selected for each of the approximately 51 visits, even though the subjective pain level sometimes stayed the same (i.e., three or four visits of pain level of 8 out of 10 and always "improved" in the "assessment" section). [Exs. 1.2 and 1.4].

140. Similarly, for Jesus Segovia, in the "assessment" section, the first chiropractic visit had an "assessment" of "improved" (even though that was the first visit), and "improved" was always selected for the approximately 48 visits, even though the subjective pain level stayed the same (i.e., three or four visits of pain level of 8 out of 10 and always "improved" in the "assessment" section). [Ex. 2.3 at 02933, *et seq.*].

141. For each chiropractic visit, Dr. Marioni would make selections in the "objective" section of the patient record for each visit. The possible selections in the "objective" section were: "burning sensation," "dull ache," "edema," "headache," "numbness," "radiating pain," "ROM

loss," "sharp," "soreness," "spasms," "stiffness," "strength def.," "swelling," "tenderness," "tingling," and "throbbing."

142. As to Jose Segovia, in the "objective section," for those records reflecting visits before the surgery, the selections were generally: "stiffness," "radiating pain," "soreness," "throbbing," "sharp," and "numbness," and the selections did not change when the subjective pain level decreased. [Exs. 1.2 and 1.4].

143. As to Jesus Segovia, in the "objective section," for those records reflecting visits before the surgery, the selections made were generally: "stiffness," "radiating pain," "soreness," "throbbing," "sharp," and "numbness," and the selection did not change when the subjective pain level decreased. [Ex. 2.3].

**Opinions of Dr. Peter Shin, M.D.**

144. Without objection, the Court permitted Dr. Shin to testify under Federal Rule of Evidence 702 in the field of neurosurgery. Except where indicated, the Court found his trial testimony and his report [Ex. 56] to be wholly credible.

145. Doctor Shin opined that (1) the medical records, reports from treating physicians, and MRI imaging show that Jose Segovia's spine pathology is degenerative on multiple levels and displayed chronic changes related to the aging process; and (2) the cervical fusion surgery that Jose Segovia underwent in December 2021 was necessary but related to degenerative changes and was *not* caused by the March 24, 2021 collision.

146. An MRI of Jose Segovia's spine taken after the March 24, 2021, accident showed evidence of chronic degenerative changes.

147. Jose Segovia's history of pain as set forth above was secondary to his spine pathology as shown on the MRI and pre-dated the March 24, 2021, collision.

148. Jose Segovia may have experienced a neck sprain or strain during the March 24, 2021, collision, but that injury would not have been visible on the MRI taken three weeks later.

**Whether Collision Was Causally Related to Injuries Claimed by Plaintiffs**

149. The Court credits Dr. Shin's testimony in its entirety, with the limited exception that the Court finds the collision in this case to have contributed to the need for Jose Segovia's cervical fusion surgery in December 2021. The Court finds that the vast majority of Jose Segovia's need for the surgery stemmed from degenerative conditions, including arthritis/spondylosis and degenerative disc disease. Nonetheless, based primarily on (a) the pre-existing fragility and already-compromised condition of Jose Segovia's cervical spine, which made him more susceptible to injury from minor impacts than the average motorist, (b) Jose Segovia's contemporaneous complaint of low-level neck pain at the scene of the collision and immediately after it happened, (c) Jose Segovia's report the next day at MountainView Urgent Care that he was still experiencing neck pain from the collision the day before, (d) the paucity of evidence of pre-existing *neck* pain in Jose Segovia's otherwise voluminous medical record, (e) Jose Segovia's neck pain being among his chief complaints during some 51 visits to the chiropractor in the four months following the March 24, 2021 collision, (f) the facet injections to Jose Segovia's neck, and (g) Dr. Shin's unwillingness to rule out that Jose Segovia may have sprained or strained his neck during the collision, the Court finds that the collision contributed to the need for Jose Segovia's cervical spinal surgery in December 2021.

150. In sharp contrast, with the sole exception of the temporary pain that caused Jesus Segovia to present at urgent care the day after the minor collision, the Court finds that Jesus Segovia did *not* prove by a preponderance of the evidence that he was otherwise injured as a result of the collision in question. In other words, Jesus Segovia did not prove by a preponderance of the evidence that any injury he may have suffered during this collision warranted medical treatment

besides the next-day visit and the one-time prescription of ibuprofen. The Court emphasizes that Jesus Segovia did not satisfactorily prove that the collision formed any part of the cause of the herniated disc he had surgically repaired eight months later. His description of the impact and his 6'1" and 280-pound body's reaction to it was exaggerated, not credible, and refuted by the wholly credible opinions based on physics and biomechanics that were provided by Mr. Mecham.

151. In addition, unlike his father, Jesus Segovia denied any pain or injury at the scene of the collision or during the investigation of it. The prompt and unsolicited outreach by the shadowy Ernesto, the involvement of an out-of-state law firm headquartered 800 miles away, and the steering of the Segovias to a local chiropractor who then steered them to associated providers struck the Court as a formula in which treatment decisions were being driven more by litigation needs than by medical needs. The Court found itself highly skeptical of claims of catastrophic medical damages arising from an impact as benign as this one was, particularly when those medical damages appear to have been orchestrated more by lawyer than by doctor.[2]

152. Whether Jesus Segovia had a legitimate medical need for the chiropractic care rendered by Dr. Marioni before or after the December 2021 surgery is a finding the Court need not make, because the Court finds that the benign impact of the collision in the Circle K parking lot *in no way* contributed to the need for that care. Whether that care was medically necessary because of at least five other collisions in which Jesus Segovia had already been involved, the degenerative condition of his own spine – or some combination of all of this or something else altogether – is another finding the Court need not make.

[2] The Court emphasizes that Plaintiffs' trial counsel were *not* their counsel until long after Plaintiffs' surgeries. Indeed, their trial counsel did not enter their appearances until July 31, 2025 (Dkt. No. 99, Attorney Saylor) and February 2, 2026 (Dkt. No. 118, Attorney Winston). Plaintiffs' trial counsel rendered superb and exemplary performance on behalf of their clients at trial. Any criticism the Court expresses in these Findings and Conclusions is directed only at Plaintiffs' *previous* counsel in Houston and their affiliates (*e.g.,* Ernesto).

153. Whether Jesus Segovia had a legitimate medical need for the injection treatment delivered by Dr. Velimirovic before the December 2021 surgery is a finding the Court need not make, because the Court finds that the benign impact of the collision in the Circle K parking lot *in no way* contributed to the need for that care. Whether that care was medically necessary because of at least five other collisions in which Jesus Segovia had been involved, the degenerative condition of his own spine – or some combination of all of this or something else altogether – is another finding the Court need not make.

154. Similarly, whether Jesus Segovia had a legitimate medical need for the partial discectomy he underwent in December 2021 is a finding the Court need not make, because the Court finds that the benign impact of the collision in the Circle K parking lot *in no way* contributed to the need for that surgery.

155. Although Jesus Segovia made his own report at MountainView Urgent Care the day following the collision, he complained of pain in areas that did *not* include his lower lumbar region, which would be the location of his surgery eight months later. Instead, he told intake staff that he had "bilateral knee pain[,] neck pain and mid back pain" but reported to the actual provider that he had "bilateral knee pain and right sided scapular pain." [Ex. 2.1 at 002176]. Unlike his father, Jesus Segovia was not referred for imaging and was prescribed only ibuprofen.

156. The Court finds that only the care that Jesus Segovia received during his visit to MountainView Urgent Care the day after the collision was reasonable and caused by the collision.

157. The reasonable value of that visit was $239.00.

**Opinions of Dr. Matthew Budway, M.D.**

158. Without objection, the Court permitted Dr. Budway to testify under Federal Rule of Evidence 702 in the field of neurosurgery. The Court also admitted into evidence his three reports. [Exs. 88–90].

159. With respect to Jose Segovia, Dr. Budway testified that the pre-surgery chiropractic care, cervical injections, and spinal surgery were medically necessary and directly causally related to the collision at issue.

160. The Court has struggled in assessing Dr. Budway's credibility. On the one hand, he has seemingly impressive credentials and professional experience. On the other hand, he was too often inattentive to detail, he was overly summary and conclusory in his reports and his testimony, and he stood alone in the Court's experience in his inability to produce a complete and accurate listing of all cases in which he has been retained as an expert witness. The Court was perplexed by Dr. Budway's insistence that the only way to perfectly reconstruct his expert witness career is by combing through years of e-mails, when a review of his *billing* for this service would have taken a fraction of the time and yielded much greater accuracy. All in all, the Court expected well more precision from one who holds himself out as a board-certified neurosurgeon.

161. Although Dr. Shin and Dr. Budway agreed on much with respect to the condition of Jose Segovia's cervical spine and the need for it to be surgically repaired, they disagreed on whether the need for that surgery arose purely from degenerative conditions or also by trauma. On that disagreement, the Court finds Dr. Budway's opinion [Ex. 88 at 4 ("Mr. [Jose] Sagovia [sic] suffered a traumatic injury to his spine")] to be conclusory and somewhat exaggerated. Doctor Budway made little if any effort to explain how such a low-velocity impact as the one at issue here could contribute to the need for surgery of a man who Dr. Shin testified *already* needed that surgery anyway. Notwithstanding its questions and concerns about Dr. Budway's opinion on causation, however, the Court finds that the collision at issue aggravated at least to some degree the condition of Jose Segovia's cervical spine and contributed to the need for it to be treated and, ultimately, surgically repaired.

162. In both his report dated August 3, 2024, and at trial, Dr. Budway opined that Jose Segovia would require future treatment for his neck, including physical therapy, chiropractic care, injections, and pain management. [Ex. 88 at 4; Tr. Vol I at 150–51]. He advised that patients like Jose Segovia should be monitored with annual x-rays and perhaps CT scans. He said that some patients require only physical therapy and injections whereas others need follow-on surgeries. He discussed the risk factors associated with cervical fusion surgery and the chances that Jose Segovia might require future surgery.

163. On the subject of Jose Segovia's need for future treatment and future surgery, Dr. Budway's testimony was insufficiently credible. This was in large part due to what Dr. Budway apparently did *not* consider in formulating those opinions. Even though he recommended regular monitoring with annual x-rays and perhaps even CT scans, he did not consider any such evidence for Jose Segovia, with the exception of a single MRI of the *lumbar* spine (not the cervical spine where the fusion occurred) taken in June 2022. And this was true even though Dr. Budway was testifying almost exactly *five years* after the collision and more than four years after Jose Segovia's fusion surgery. Dr. Budway apparently had no evidence of what Jose Segovia's cervical spine looks like now, whether its condition was the same or worse than it was shortly after the surgery, or whether updated imaging studies could be helpful in confirming or dispelling his suspicions about the need for future treatment.

164. A second basis for discounting Dr. Budway's opinions about the need for future treatment is that he failed to meaningfully discuss what if any treatment Jose Segovia has received since his surgery. Apart from some follow-on chiropractic care and physical therapy during the first year post-surgery, the Court received no other evidence. Fifty months separated Jose Segovia's surgery and Dr. Budway's trial testimony, but the latter spent virtually no time

discussing whether Jose Segovia had been treated at all in the interim and how the presence or absence of such treatment might affect the need for similar treatment going forward.

165. Still another basis for discounting Dr. Budway's opinions, especially about the need for future treatment including surgeries, is his failure to account for the contributory effects of all the other motor vehicle accidents in which Jose Segovia had been involved. The Court does not know whether Dr. Budway was even aware of the multiple motor vehicle collisions that Jose Segovia had endured, virtually all of which were more serious than the one at issue here.

166. At the conclusion of Dr. Budway's testimony about Jose Segovia, the Court was left with the distinct impression that guesswork by experts is little better than speculation by lay witnesses. As a result, the Court finds that Jose Segovia did not prove by a preponderance of the evidence that he will require future medical treatment associated with the localized injury he incurred in the collision at issue here.

167. With respect to Jesus Segovia, Dr. Budway opined, *inter alia*, that there was "a direct causal relationship between Mr. Sagovia's [sic] low back pain and leg pain and his March 24th, 2021, motor vehicle accident." [Ex. 89 at 4]. Central to this opinion was Dr. Budway's belief that Jesus Segovia presented at urgent care the day after the accident for "neck and *low back* pain." *Id.* at 3 (emphasis added). Yet that is *not* what Jesus Segovia presented for, or complained about, the day after the collision. [*See* ¶ 155, *supra*]. In fact, Jesus Segovia did not begin complaining about *low back* pain until Ernesto and the Herring Law Firm referred him to Chiropractor Marioni. For Dr. Budway to make a mistake as foundational, careless, and preventable as this one – and then not correct it leading up to or even at trial – causes the Court serious skepticism about the viability of his opinions with respect to Jesus Segovia. Consequently, the Court finds that Dr. Budway's testimony with respect to Jesus Segovia was not sufficiently credible. This assessment, coupled with the other reasons previously identified [*see* ¶¶ 150–51, *supra*], confirms the Court's

finding that Jesus Segovia did not prove by a preponderance of the evidence that – but for the next-day visit to urgent care that resulted in a prescription for ibuprofen – he was injured at all during the collision at issue.

**Reasonable Value of Property Damage**

168. Jose Segovia's first administrative claim (dated June 11, 2021) listed property damages to the Honda Civic at $2,892.11, along with a repair estimate for the same amount. [Ex. 98]. The repair estimate listed damages to the Civic's rear bumper, rear lamps, and back glass. Over Plaintiffs' objection, the Court permitted the United States to introduce this exhibit into evidence. The Court considers the exhibit to be reliable evidence of the repair cost for the damage to the Civic caused by the Silverado. No additional trial evidence was necessary.

**Reasonable Value of Medical Expenses**

169. Over the objection of the United States, the Court permitted Nestor Bonilla to testify under Federal Rule of Evidence 702 in the field of healthcare finance, including the usual, customary, and reasonable value of medical expenses. The Court also admitted into evidence his two reports. [Exs. 83–84]. Although Mr. Bonilla had been deposed 36 times, this was his first experience testifying as an expert witness in court.

170. Mr. Bonilla received from the law firm representing Plaintiffs the medical bills that they decided were related to the collision. He did not independently validate the bills or question their relatedness to the collision. Instead, he included all the bills he received in his analysis.

171. As best he could explain it, Mr. Bonilla's methodology for calculating the usual, customary, and reasonable ("UCR") rate for medical expenses involves comparing what competitors in the relevant geographic area charge for similar services. He normally does this by consulting and cross-checking various databases, including Context 4 Healthcare, PMIC Physician Fee Schedule, and American Hospital Directory. If the particular charge is within the UCR range,

then he adds it to the total. If the charge is above or below the range, he engages in additional inquiry to determine whether there is a valid reason why before including the charge in his analysis.

172. Mr. Bonilla also explained, either in his testimony or his report or both, how healthcare providers come up with their fee schedules. This process, which ultimately produces the "chargemaster" rate or fee schedule, considers various factors like direct and indirect costs, market factors, and regulatory requirements. He took pains to emphasize the distinction between the chargemaster rate for a particular service and the often discounted amount that government programs or commercial insurers might pay for it.

173. Because the Court has found that, but for the next-day visit and the one-time prescription for ibuprofen, Jesus Segovia did not prove by a preponderance of the evidence that he was injured in the collision at issue, the Court will focus only on Mr. Bonilla's calculation of the UCR value of Jose Segovia's medical treatment. His overall opinion was that, although the medical bills that Plaintiffs' law firm submitted on Jose Segovia's behalf totaled $504,269.69, the UCR value amounted only to $380,508.13. Mr. Bonilla was cross-examined at length about various individual charges, their original billed amounts, and how he computed their UCR values. He struggled to explain, for example, why a particular service could be billed at one amount by one provider and at a much larger amount by a different provider, yet both amounts be considered UCR. He had some difficulty explaining other discrepancies and reconciling other incongruencies in his computational summary. Nonetheless, with an important caveat, the Court found Mr. Bonilla's testimony and report [Ex. 83] credible enough to sustain a finding by a preponderance of the evidence that the UCR value of Jose Segovia's medical bills associated with the injury he suffered in the collision at issue amounted to $380,508.13.

174. The important caveat referred to in the preceding paragraph relates to post-surgical treatment undergone by Jose Segovia. In addition to sustaining the United States' objections that

Jose Segovia did not introduce admissible evidence that his post-surgical chiropractic care was causally related to the collision at issue [Tr. Vol. I at 141–42], the Court finds that Jose Segovia did not otherwise prove by a preponderance of evidence that the following sums included in Exhibit 83 were causally related to the collision at issue: (a) Foothills Medical Center, 9/30/22-12/19/22, $9,096.96 [Ex. 83 at 37-41]; (b) MountainView Regional Medical Center, 1/15/22-3/19/24, $24,481.20 [Ex. 83 at 15]; and (c) My Doctor Medical Group, 3/16/22-7/1/26, $8,004.00 [Ex. 83 at 29–35]. Consequently, the Court has subtracted $41,582.16 from Mr. Bonilla's UCR computation for Jose Segovia's past medical expenses, bringing that component of damages down to $338,925.97.

**Damages for Impairment, Pain & Suffering, Emotional Distress, and Lost Enjoyment of Life**

175. Jose Segovia introduced very little evidence of any pain and suffering, emotional distress, or lost enjoyment of life he experienced due to the injury he sustained in the collision. Jose Segovia's medical history demonstrates that pain has been a relatively constant companion for many years. Compared to the conditions that previously required him to be prescribed high-potency painkillers and muscle relaxants and to self-treat with marijuana, the injury sustained in the collision at issue does not appear as serious. The Court received no evidence that Jose Segovia was prescribed a lengthy regimen of pain medication leading up to or in the wake of his cervical spinal surgery. Nor did the Court receive significant evidence contrasting his physical capacity, emotional condition, or his enjoyment of life before and after the collision or before and after the surgery. The Court infers from his testimony and the rest of the evidence that Jose Segovia's cervical fusion surgery was successful and that he is now better off because of it.

176. In the absence of direct evidence of impairment, past/future pain and suffering, past/future emotional distress, and past/future loss enjoyment of life, the Court is left to do the best it can to assign a dollar value based on the evidence in the record. Based on the evidence

introduced, especially regarding Jose Segovia's pain after the accident and the lengthy treatment regimen necessary to resolve it, the Court finds it reasonable in this case to assess Jose Segovia's impairment, past/future pain and suffering, and past/future emotional distress at the total figure of $200,000.00.

177. The Court likewise finds it reasonable to assess Jesus Segovia's impairment, past/future pain and suffering, and past/future emotional distress at a total of $239.00.

**Damages for Future Medical Treatment**

178. For the reasons explained above [*see* ¶¶ 163–66, *supra*], the Court finds that Jose Segovia did not prove by a preponderance of the evidence that he will need future treatment, including future surgeries, caused by the March 24, 2021 collision. The same is true for Jesus Segovia. Consequently, the Court computes that component of damages to be $0.00.

**Damages for Loss of Earning Capacity and Household Services**

179. Although the First Amended Complaint [Dkt. No. 9 at ¶¶ 25–26] requested damages for Jose Segovia for loss of earning capacity and lost value of household services, he introduced no evidence in support of either. Accordingly, the Court computes these components of damages to be $0.00. For his part, Jesus Segovia withdrew his claim for lost earnings and earning capacity and introduced no evidence of the lost value of his household services.

**Damages for Disfigurement**

180. Although the First Amended Complaint [Dkt. No. 9 at ¶ 30] requested damages for disfigurement, neither Plaintiff introduced evidence to support that request. Accordingly, the Court computes this component of damages to be $0.00.

**Prejudgment Interest and/or Punitive Damages**

181. By statute, neither prejudgment interest nor punitive damages are awardable against the United States under the Federal Tort Claims Act. 28 U.S.C. § 2674.

**CONCLUSIONS OF LAW**

1. Jurisdiction and venue in this matter are proper.

2. The Federal Tort Claims Act waives the United States' sovereign immunity "for injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

3. The relevant law is "the law of the place where the act or omission occurred," here the law of New Mexico.

4. A claimant for recovery founded on negligence in New Mexico must establish four elements: "(1) defendant's duty to the plaintiff, (2) breach of that duty, typically based on a reasonable standard of care, (3) injury to the plaintiff, and (4) the breach of duty as cause of the injury." *Zamora v. St. Vincent Hosp.*, 2014-NMSC-035 ¶ 22, 335 P.3d 1243, 1249.

5. An act, to be "negligence," must be one which a reasonably prudent person would foresee as involving an unreasonable risk of injury to themselves or to another and which such a person, in the exercise of ordinary care, would not do. UJI 13-1601 NMRA (excerpted).

6. "Ordinary care" is that care which a reasonably prudent person would use in the conduct of the person's own affairs. What constitutes "ordinary care" varies with the nature of what is being done. As the risk of danger that should reasonably be foreseen increases, the amount of care required also increases. In deciding whether ordinary care has been used, the conduct in question must be considered in light of all the surrounding circumstances. UJI 13-1603 NMRA.

7. It is the duty of every operator of a vehicle to exercise ordinary care, at all times, to prevent an accident. UJI 13-1201 NMRA.

8. It is the duty of every operator of a vehicle to keep a proper lookout and to maintain proper control of his vehicle so as to avoid placing the operator or others in danger and to prevent an accident. UJI 13-1202 NMRA.

9. The duty to keep a proper lookout requires more than merely looking. It also requires a person to actually see what is in plain sight or obviously apparent to one under like or similar circumstances. Further, with respect to that which is not in plain sight or readily apparent, a person is required to appreciate and realize what is reasonably indicated by that which is in plain sight. UJI 13-1203 NMRA. Maintaining a proper lookout is not a duty to see everything; only a duty to exercise ordinary care as to what is to be seen. *Trujillo v. Treat*, 1988-NMCA-017, 107 N.M. 58, 60.

10. The mere happening of an accident is not evidence that any person was negligent. Neither the fact that damages are claimed due to the accident nor the fact that this lawsuit was filed is evidence of any negligence on the part of any person. UJI 13-1616 NMRA.

11. A party seeking a recovery has the burden of proving every essential element of the claim by the greater weight of the evidence, which simply means that something is more likely true than not true. UJI 13-304 NMRA.

12. "[I]t is the function of the [factfinder], to judge the credibility of witnesses, to appraise their testimony, to weigh contradictory testimony and conflicting circumstances, and to draw the ultimate conclusions as to the facts, whether they relate to negligence or some other issue." *McKenna v. Scott*, 202 F.2d 23, 24 (10th Cir. 1953).

13. SA Montoya had a duty to keep a proper lookout and to maintain control of his vehicle so as to avoid placing other persons in danger and to avoid an accident. *Lopez v. Maes*, 81 N.M. 693, 472 P.2d 658 (Ct. App. 1970); UJI 13-1201 NMRA; UJI 13-1202 NMRA.

14. SA Montoya breached that duty. His driving conduct on March 24, 2021, that culminated in the collision was negligent.

15. Jose Segovia did not breach his reciprocal duty, nor did Jesus Segovia breach any duty he may have owed to keep a proper lookout.

16. The United States is 100% liable for the collision at issue.

17. An act or omission is a cause of the injury if it contributes to bringing about the injury. It need not be the only explanation for the injury, nor the reason that is nearest in time or place. It is sufficient if it occurs in combination with some other cause to produce the result. To be a cause, the act or omission nonetheless must be reasonably connected as a significant link to the injury. UJI 13-305 NMRA.

18. For the reasons previously stated in the factual findings, the collision for which Agent Montoya was entirely responsible contributed to Jose Segovia's cervical spinal injury, ultimately necessitating fusion surgery. Other than a next-day visit to urgent care and an ibuprofen prescription, however, the collision did not cause injury to Jesus Segovia.

19. The factfinder "may proceed to determine the amount of damages suffered by a plaintiff only after determining that the defendant is liable." *Marquez v. Martinez*, No. 11-cv-838 JAP/KBM, 2015 WL 5090467, at *7 (D.N.M. May 1, 2015) (quoting UJI 13-1801 NMRA) ("You are not to engage in any discussion of damages unless you have first determined that there is liability."). *See also* UJI 13-1802 NMRA ("If you should decide in favor of the plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate the plaintiff for any of the following elements of damages proved by the plaintiff to have resulted from the negligence.").

20. In determining an award of damages, the Court fixes the amount of money which will reasonably and fairly compensate either or both Plaintiffs. UJI 13-1802 NMRA. The Court

awards damages based upon proof and not upon speculation, guess or conjecture. Further, sympathy or prejudice for or against a party should not affect the verdict and is not a proper basis for determining damages. *Id.*

21. Damages are to be measured without regard to the fact that a plaintiff may have been unusually susceptible to injury or likely to be harmed. The defendant is said to "take the plaintiff as the defendant finds" the plaintiff, meaning that the defendant, if liable, is responsible for all elements of damages caused by the defendant's conduct even if some of the plaintiff's injury arose because the plaintiff was unusually susceptible to being injured. UJI 13-1802 NMRA.

22. Plaintiff Jose Segovia's Honda was damaged in the accident.

23. New Mexico law provides for the calculation of property damage as follows: If the damaged property has no salvage value, the property damages is "the fair market value of the property immediately before the occurrence." UJI 13-1812 NMRA. If the damaged property has salvage value, the amount of property damages is "the reasonable expense of necessary repairs to the property which was damaged." UJI 13-1813 NMRA.

24. Based on an estimate to repair damages associated with the collision at issue, the Court finds the cost to repair the Honda Civic is $2,892.11.

25. New Mexico law provides for the recovery of "the reasonable expense of necessary medical care, treatment and services received" and caused by the subject accident. UJI 13-1802 NMRA; UJI 13-1804 NMRA; *Garcia v. DeLeon*, No. A-1-CA-41324, 2025 WL 3298036, at *2 (N.M. Ct. App. Nov. 26, 2025) ("Plaintiff had the burden of demonstrating, through expert testimony, that her medical expenses were reasonable, necessary, and causally related to the accident.").

26. In awarding damages for pain and suffering, the Court must use its judgment to decide a reasonable amount to compensate the plaintiff for the pain and suffering. UJI 13-1807 NMRA. No fixed standard exists for deciding the amount of these damages. *Id.*

27. In awarding damages for future medical expenses, damages are based upon the present cash value of the reasonable expenses of medical care, treatment, and services reasonably certain to be received in the future. UJI 13-1804 NMRA.

28. In awarding hedonic damages (loss of enjoyment of life) or other disfigurement or impairment damages, damages are calculated based upon the loss of enjoyment of life experienced and reasonably certain to be experienced in the future as a result of the injury. UJI 13-1807A NMRA. No fixed standard exists for deciding the amount of these damages, and a court must use its best judgment to decide a reasonable amount to compensate the plaintiff for the loss of enjoyment of life. *Id*.

29. The reasonable value of the medical care that Jose Segovia proved was caused by the collision at issue is $338,925.97.

30. The reasonable value of the medical care that Jesus Segovia proved was caused by the collision at issue is $239.00.

31. Jose Segovia's impairment, past/future pain and suffering, past/future emotional distress, and past/future loss of enjoyment of life are valued at single total of $200,000.00.

32. Jesus Segovia's impairment, past/future pain and suffering, past/future emotional distress, and past/future loss of enjoyment of life are valued at single total of $239.00.

33. Plaintiffs did not meet their burden of proving by a preponderance of the evidence any future medical expenses, disfigurement, loss of earnings or earning capacity, or loss of household services.

34. Jose Segovia's total damages are $541,818.08.

35. Jesus Segovia's total damages are $478.00.

**SO ORDERED.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***